# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 12-21967-CIV-SEITZ/SIMONTON

MARIE CLAUDE-MORENCY,

   Plaintiff,

      v.

UNIVERSITY OF MIAMI,

   Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

THIS MATTER came before the Court upon Defendant's Motion for Sanctions Against Plaintiff's Counsel, which Defendant has elected to have the Court consider as a Motion for Summary Judgment. [DE 10; DE 15]. This is a Title VII employment discrimination case. Plaintiff, a per diem Certified Nursing Assistant, alleges that her former employer the University of Miami ("UM") discriminated against her because she was pregnant.[1] Plaintiff became pregnant with her third child in January 2010, gave birth in September 2010, and was fired from UM in March 2011. UM asserts that Plaintiff's firing was the result of an administrative oversight which was corrected, but Plaintiff elected to not return to work.

Having considered Plaintiff's opposition [DE 23, 24, 55], Defendant's Reply [DE 32], and the record evidence, no reasonable juror could find that Plaintiff's pregnancy was the reason for her termination. Therefore, UM is entitled to the entry of summary judgment. By separate contemporaneous Order, the Court has denied Defendant's motions for sanctions because

---

[1] Plaintiff's complaint alleges that she was the victim of both gender and pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et. seq., as amended. Based on the record evidence Plaintiff's gender discrimination claim is indistinct from her pregnancy discrimination claim.

Morency's claim is not meritless within the meaning of Rule 11 nor did her counsel act in bad faith by pursuing this cause on her behalf.

## I.    BACKGROUND[2]

### A.  UM's Per Diem Employment Policy

Plaintiff worked at UM Hospital on a per diem basis from January 2009 until she was fired in March 2011. Unlike permanent staff, per diem staff are not guaranteed a set number of hours of work per week, nor do they work on a regular schedule.[3] Rather, per diem employees work on an "as needed basis" because they are on-call backup to permanent staff and are called in "to provide [permanent] staff relief or to assist during peak, workload periods." (UM Per Diem Agreement, DE 10-2, ¶2). As a condition of employment all per diem staff must work a minimum of 32 hours a month including one weekend per month. According to UM's per diem policies, per diem employees may be terminated if unavailable to work for more than 90 days.

Plaintiff primarily worked in the Behavioral Health department.[4] The Behavioral Health department was overseen by Jose Santa ("Santa"). The department handled day to day personnel management internally. Maria Garcia ("Garcia") was the individual primarily responsible for scheduling Plaintiff and other per diem employees for their shifts. Hilda Rodriguez

---

[2] Unless otherwise noted, the facts are taken from the undisputed record evidence. The facts are rendered and construed in the light most favorable to Plaintiff.

[3] In an Affidavit filed with her opposition, Plaintiff contends for the first time that as a per diem employee she was entitled to two work shifts per week. (Affidavit of Marie Claude-Morency ("Morency Aff") [DE 27-22], ¶9). This is the only such evidence of UM guaranteeing its per diem workers a certain number of shifts in the record which is well-developed on the point and includes copies of Plaintiff's signed Per Diem Agreement [DE 10-2, Ex. 1], the hospital's per diem policies [DE 10-7], and testimony on the per diem program from depositions of Plaintiff (("Plaintiff Dep.), DE 10-2), and Behavioral Health and HR management personnel familiar with the per diem system. Given that the record evidence on the point is well-developed and that the sole contrary evidence is contained within an affidavit filed with Plaintiff's opposition to Defendant's sanctions motion, the Court will not consider this uncorroborated statement as introducing a genuine disputed issue of material fact.

[4] At the time of these events the University of Miami hospital had the largest behavior health program in Miami-Dade County with 104 psychiatric beds and a twenty-four hour, seven-day a week emergency psychiatric department.

("Rodriguez") was the department's nursing supervisor and provided oversight for the nursing staff. Garcia and Rodriguez both reported to Santa. The hospital's Human Resources ("HR") department handled non-routine personnel matters including Plaintiff's medical leave requests, return to work from maternity leave, and her termination.

### A. Plaintiff's Non-Time-Barred Allegations[5]

#### 1. Plaintiff Alleges that HR Misled Her About the Availability of Her Job After Maternity Leave

Plaintiff gave birth on September 28, 2010, and on October 20, 2010, exhausted her twelve weeks of Family Medical Leave Act ("FMLA") leave. She then asked for, and received, leave under UM's General Medical Leave ("GML") policy. GML is given to employees as a matter of course. It is a temporary, unpaid leave of absence, but it differs from FML in that the employee's job is not protected while she is out on GML. (*See* Deposition of Cloris Nunez, DE 10-4, p. 12).

---

[5] A plaintiff filing suit for workplace discrimination must first file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001). In Florida, a Plaintiff-employee has 300 days from the date of the last allegedly discriminatory act to file her charge of discrimination. 42 U.S.C. § 2000e–5(e)(1); *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1271 (11th Cir. 2002). Plaintiff filed her charge on June 21, 2011. As such, the only actionable claims in Plaintiff's case are those that occurred after August 25, 2010, the last day of the 300-day reach back period. Those allegedly unlawful employment practices that occur outside of the reach back period, even if substantiated, are presumed lawful and "ceas[e] to have legal significance." *City of Hialeah v. Rojas*, 311 F.3d 1096, 1102 (11th Cir. 2002). Plaintiff's allegations from before August 25, 2010, are summarized here only for background purposes.

Plaintiff alleges she was first subject to UM's discriminatory practices in April 2010, when, in the fourth month of Plaintiff's pregnancy, Jose Santa strongly urged HR to require Plaintiff to get her doctor's clearance before reporting to work. Plaintiff's doctor did in fact restrict Plaintiff's lifting just a few days after Santa's request to HR. [DE 33-1, DE 33-2]. Plaintiff's duties as a CNA required that she be able to lift fifty pounds, and because she primarily worked with geriatric patients she had to be able assist her immobile patients to turn over. However, her doctor restricted her to lifting no more than 15 pounds. [DE 33-2].

Next, Plaintiff alleges that Santa targeted her for "potential termination" in June 2010 by asking HR about the status of a class-action grievance Plaintiff and two other per diem CNAs had filed in which they requested to become permanent employees. Around the same time, Plaintiff made requests within her department to change her work schedule because of difficulties in getting childcare for her two young children. In emails sent to Santa, Rodriguez, and Garcia, Plaintiff requested that she be scheduled to work only Mondays and Tuesdays because she had a babysitter only on these nights. She also requested that after her baby was born in September that she be scheduled for the day shift as opposed to the night shift, which she had worked exclusively while employed at UM. It is undisputed that at all times the Behavior Health department's need for per diem employees was at night. (Deposition of Jose Santa ("Santa Dep."), DE 33-5, p. 32). Plaintiff alleges she was never contacted regarding either request.

On December 27, 2010, Plaintiff met with Jarren Short, an HR manager, and Cloris Nunez, an HR Generalist, to discuss her return to work. Short and Nunez seem to have believed, wrongly that, (a) Plaintiff regularly worked shifts other than the night shift before she went on her maternity-related FML and GML; and (b) that Plaintiff's previous position had been filled while she was out. Short and Nunez advised Plaintiff that the only work UM could offer her was per diem work on the night shift. It is undisputed, however, that both before and after Plaintiff's pregnancy, she was a per diem employee and only worked the night shift.

### 2. *Plaintiff Only Works Two Shifts Between January and February 2011*

After Plaintiff returned from leave she only worked two shifts before she was fired, one on January 13, 2011, and the other on February 21, 2011. Before Plaintiff's pregnancy she worked between 28 to 42 shifts in a comparable period. [DE 27-22 at ¶12]. Plaintiff stated in her deposition that she was only called to work twice between January and March and that she regularly contacted the Behavioral Health department scheduler Maria Garcia to request more shifts, but Garcia told her the unit was slow at that time and that Morency was not needed.[6] Plaintiff claims that she applied for another job with Senior Health Services, an elderly care provider, in November 2010 because "Miami University Hospital (*sic*) always told me it was slow, slow, slow, so I need to get a job, so I made [an] application to this place." (Plaintiff Dep.,

---

[6] How many times UM contacted Plaintiff to work after she returned from maternity leave is in dispute in this case. Defendant has produced business records of per diem scheduling attempts that indicate Morency was called at least nine (9) times in January and February with offers for shifts. [DE 27-14]. The record also contains testimony from Maria Garcia, the Behavior Health unit scheduler and an affidavit from Nursing Manager Hilda Rodriguez describing their multiple efforts to offer Plaintiff work. (Deposition of Maria Garcia ("Garcia Dep."), DE 27-27, p. 27); (Affidavit of Hilda Rodriguez, DE 10-13, ¶¶7 – 8). Defendant's business record and testimonial evidence notwithstanding, at the Summary Judgment stage the non-movant's version of events is accepted as true (*See Kingsland v. City of Miami*, 382 F.3d 1220, 1227 (11th Cir. 2004). Thus, the Court assumes that UM only contacted Morency twice.

Separately, the Court notes that the pages of the Garcia Deposition to which Defendant repeatedly cites have not in fact been filed in the record. [DE 32, p. 8]. The only part of the Garcia Deposition that has been filed in the record are the highly excerpted portions that Plaintiff filed in support of her opposition. *See* [DE 27-27]. The pages to which Defendant cites, in which Garcia apparently "elaborated on her efforts to offer Morency work" [DE 32, p. 8], are not among these. The Court has only considered the record evidence actually before it and has not considered any unsubstantiated factual proffers made in either party's motion papers.

DE 10-2, p. 37:14 – 19).  Plaintiff references the unit's slowness again in her affidavit when she states that when she would call Garcia to request more shifts, her calls "would go unreturned, or [Garcia] would inform me, that, suddenly, they were slow." (Plaintiff Aff., DE 27-22, at ¶11).

### 3.  *Plaintiff is Terminated and Reinstated*

On March 16, 2011, Santa emailed Short a list of six per diem employees who were "non-utilized," meaning that they "were not available when . . . need[ed] or [they] failed to comply with hospital and departmental requirements." [DE 10-16].[7]  Morency's name was on the list for "non-utilization, failure to comply." [DE 10-16].  Short testified in his deposition that if a per diem employee was inactive for 90 days or more, meaning the employee had not worked within the 90 days preceding, the employee would receive a termination letter.  Employees who were otherwise non-compliant with the hospital's per diem policy would only receive letters advising them of their non-compliance.  (Deposition of Jarren Short, ("Short Dep."), DE 10-5, p. 36 – 37).  Short's review of Plaintiff's time records caused him to believe that Plaintiff's last day of work was July 14, 2010, and therefore, he sent her a termination letter because of her supposed failure to work within the 90 day period.  *Id.* at p. 40 – 41.

Plaintiff was shocked to receive the termination letter. (Plaintiff Aff., DE 27-27, ¶13).  Plaintiff had in fact worked twice in the 90 days preceding the letter, once in January and once in February, 2011.  Plaintiff called her union representative Marie Jean-Phillipe to advise Jean-Phillipe that she had been fired without good cause.  (Deposition of Marie Jean-Phillipe, ("Jean-Phillipe Dep.") DE 33-12, p. 13).  Jean-Phillipe confirmed that Plaintiff had in fact worked in January and February, filed a grievance on her behalf on April 5, 2011  [DE 10-2, Ex. 15], and then scheduled a meeting with Short.

---

[7] In his deposition, Santa testified that emails like the one he sent Short on March 16, 2011, were motivated by creeping overtime costs among permanent staff and the need to cut overtime payments by ensuring that per diem workers were utilized.  (Santa Dep.,  pp. 66 – 67).

Jean-Phillipe met with Short regarding Morency and three other individuals who Jean-Phillipe stated were also "taken off the schedules." (Jean-Phillipe Dep., p. 13:14). Short re-reviewed Plaintiff's time entries and realized he had made a mistake when he originally read the printout of Plaintiff's utilization. (Short Dep., p. 40 – 41). UM advised Jean-Phillipe it would reinstate Plaintiff. (Jean Phillipe Dep., p. 26 – 27).

Jean-Phillipe made several attempts to advise Plaintiff of her reinstatement. (Jean-Phillipe Dep., p. 27 – 28). Jean-Phillipe made multiple calls to Plaintiff and even went so far as to go to Plaintiff's house, but she could not make contact with her. Following these attempts, Jean-Phillipe contacted Magaly Charles-Attiene, Plaintiff's co-worker, friend, and neighbor. *Id.* at p. 28 – 29. Charles-Attiene was also one of the three individuals "taken off the schedules" and was herself represented by Jean-Phillipe. Jean-Phillipe asked Charles-Attiene to tell Plaintiff that she had been reinstated. Charles-Attiene subsequently advised Jean-Phillipe that Plaintiff no longer wanted the job and did not wish to return to UM because Plaintiff had found another job.[8] *Id.* at p. 34 – 35. Jean-Phillipe testified that upon learning the Plaintiff did not intend to return to work she closed the grievance on the basis of Plaintiff's non-cooperation and sent Plaintiff a letter advising her of the same. *Id.* at p. 36.

## II.   SUMMARY JUDGMENT MUST BE GRANTED FOR UM

### A.  Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Once the moving

---

[8] Plaintiff admits that she started working for a different employer, Senior Healthcare, in January or February of 2011. (Plaintiff Dep., p. 44).

party demonstrates the absence of a genuine issue of material fact, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting* Fed. R. Civ. P. 56(e)). The Court must view the record and all factual inferences therefrom in the light most favorable to the non-moving party and decide whether "'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (*quoting Anderson*, 477 U.S. at 251-52)).

### B. *Legal Framework for Pregnancy Discrimination Cases*

Title VII prohibits employment discrimination on the basis of sex. *See* 42 U.S.C. § 2000e–2(a). The Pregnancy Discrimination Act amended Title VII to expand sex-based discrimination to include discrimination "on the basis of pregnancy, childbirth or related medical conditions." *Id.* § 2000e(k). "The analysis for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits." *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000).

Plaintiff's claim is advanced under a disparate treatment theory. To be successful on this type of claim, "proof of discriminatory motive is critical." *Id.* Discriminatory motive may be proven by direct evidence or circumstantial evidence. *Dixon v. Hallmark Cos., Inc.*, 627 F.3d 849, 854 (11th Cir. 2010). The parties agree that this is a circumstantial evidence case. In such a case, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Hall v. Ala. Ass'n of Sch. Bds.*, 326 F.3d 1157, 1166 (11th Cir. 2003). To establish her *prima facie* case Plaintiff must show the following: 1) that she was a member of a protected class; 2) she was qualified to do the job; 3) she was subjected to an adverse employment action; and 4)

similarly situated employees outside of the protected class were treated differently. *See Wilson v. B/E Aerospace, Inc*, 376 1079, 1091 (11th Cir. 2004). Once the Plaintiff has made this initial showing, she is entitled to a presumption that the employer discriminated against her. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under the Supreme Court's *McDonald Douglas* framework, the burden of production then shifts to the employer to rebut the presumption of discriminatory motive by articulating a legitimate, nondiscriminatory reason for its actions. *Wilson*, 376 F.3d at 1087. If the employer identifies a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination vanishes. The plaintiff reassumes the burden and must "demonstrate that the proffered reason was not the true reason for the employment decision." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981). The plaintiff "cannot recast the reason but must meet it head on and rebut it." *Wilson*, 376 F.3d at 1088. When the burden shifts back to the plaintiff to rebut the employer's proffered reasons it "merges with the [plaintiff's] ultimate burden of persuading [the finder of fact] that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256.

A Plaintiff's non-production of "comparator" evidence, that is, evidence that similarly situated employees outside of the Plaintiff's protected class were treated differently, is not fatal to Plaintiff's Title VII claim. *See Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249 (11th Cir. 2012). In the absence of comparator evidence, a Plaintiff may still prevail if the evidence on the whole "yields the reasonable inference that the employer engaged in the alleged discrimination." *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011). A triable issue of fact exists if the record, viewed in the light most favorable to the Plaintiff, shows

"a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Id.* at 1328 (quotation marks and footnote omitted).

1. *Plaintiff's Claims Fail Under the McDonald Douglas Framework* [9,10]

    a. Plaintiff Cannot Make A *Prima Facie* Case of Discrimination on the Basis of Short's and Nunez's Incorrect Representations About the Unavailability of Her Job

Short and Nunez incorrectly told Plaintiff when they met with her on December 27, 2010, that the job she previously held in the Behavioral Health department had been filled while she was out on GML. They offered Plaintiff a per diem position where she would only work the night shift. It is undisputed that Plaintiff was hired as per diem employee, never held any other status at UM apart from per diem, and only ever worked the night shift. Though Short and Nunez did not know it, they effectively returned Plaintiff to the exact position she had before she became pregnant and under the same terms of employment.

In order to sustain a *prima facie* case of discrimination Plaintiff must show that she was subjected to an adverse employment action. The Eleventh Circuit has explained that "adverse employment actions" constitute a serious material change in the terms, conditions, or privileges of employment. *See Holland v. Gee*, 677 F.3d 1047, 1057 (11th Cir. 2012). Regardless of Short's and Nunez's belief, Plaintiff's assignment as a per diem CNA on the night shift was a return to the *status quo ante*, and as such cannot be considered an adverse employment action.

    b. Plaintiff Cannot Make a *Prima Facie* Case of Discrimination as to the Substantial Reduction in Her Hours

---

[9] UM neither challenged Plaintiff's status as a member of a protected class nor did it challenge whether she was qualified for her job as a per diem CNA. Without deciding either, the Court assumes these to be true and in evaluating whether Plaintiff established a *prima facie* case focuses only on whether the evidence shows that Plaintiff suffered an adverse employment action and that similarly situated non-pregnant employees were treated differently.

[10] As discussed in note 5 *infra*, Plaintiff's allegations before August 25, 2010 are time barred. However, even if these allegations were not time-barred, they would not be cognizable as evidence of disparate treatment. None of these are "adverse employment actions" in that they do not constitute a serious material change in the terms, conditions, or privileges of Plaintiff's employment. *See Holland v. Gee*, 677 F.3d 1047, 1057 (11th Cir. 2012).

It is undisputed that Plaintiff only worked two shifts after she returned to work from GML, one shift in January and another in February. Pre-pregnancy, Plaintiff would work between 28 and 42 shifts in a comparable period. Assuming that UM's cutting Plaintiff's shifts was an adverse employment action,[11] to make her *prima facie* case under *McDonald Douglas* Plaintiff still needs to show that similarly situated employees outside of her protected class were treated differently. Here, Plaintiff has not produced any comparator evidence that non-pregnant per-diem employees who worked as CNAs in the Behavioral Health department did not also have their hours substantially cut in January, February, and March of 2011.[12] The only record evidence concerning the scheduling of other per diem employees during this time period are the excerpted per diem contact records which Defendant introduced to prove that it made multiple attempts to contact Plaintiff. Problematically for Plaintiff, all of these records show that Plaintiff was called along with the other per diem employees listed.[13] Even assuming that the individuals listed in the records were not of Plaintiff's protected class, the evidence is not probative of differential treatment.

However, assuming even further that Plaintiff had made her *prima facie* case, her claim of discrimination as to her hours being cut would fail under *McDonald Douglas* because she does not rebut UM's proffered non-discriminatory reason for not calling her to work. UM told

---

[11] The Tenth Circuit has found that reduced shifts constitute an adverse employment action on grounds that reduced hours result in lower wages paid to the employee but that case involved a retaliatory discharge claim under state law, not a disparate treatment discrimination claim under Title VII. *Bergstrom-Ek v. Best Oil Co.*, 153 F.3d 851 (10th Cir. 1998). Here, neither party has questioned whether cutting a per diem employees hours constitutes an adverse employment action.

[12] Such evidence may have included affidavits or testimony from identified comparators showing, for example, that they did not have their hours drastically reduced, documentary evidence showing that utilization rates of other per diems outside of Morency's protected class had not substantially gone down or testimony from personnel involved in scheduling that confirmed that the Behavioral Health department was not utilizing per diems at a much lower rate.

[13] This is not to state that the Court has accepted UM's factual assertion that it attempted to contact Morency numerous times. Rather, the records are discussed only to show they are not probative of differential treatment such that they might constitute comparator evidence in furtherance of Morency making her *prima facie* case.

Plaintiff more than once that it was "slow." Plaintiff's own deposition and affidavit corroborate this fact.[14]   UM utilizes per diem employees "to provide staff relief or to assist during peak, workload periods." Factually, that means that in January, February, and March of 2011, the Behavioral Health department actually required less per diem backup than it would when it was not slow. Plaintiff has not provided any evidence – per diem utilization records, patient census data, or even testimony from other per diem employees – to rebut UM's claim that it did not call Plaintiff simply because per diem backup was not needed at the time.

c.   Plaintiff Cannot Make a *Prima facie* Case as to Her Termination

Jarren Short admitted in his deposition that he made a mistake in overlooking that Plaintiff had worked twice in 2011. Short also testified that the actions UM takes with respect to non-compliant per diem employees depends on the type of non-compliance. Those employees who are non-complaint with the per diem policy insofar as not working the required 32 hours and two weekend shifts per month are sent a notification of non-compliance. Employees that are unavailable for 90 days are sent a notice of termination. Plaintiff was non-compliant insofar as she failed to work 32 hours and two weekend days per month, but was compliant with the 90-day non-availability rule. In its motion for summary judgment, UM acknowledges that Plaintiff should have been notified of non-compliance instead of notified of termination. [DE 10, p. 16].

Plaintiff's firing was unquestionably an adverse employment action. But Plaintiff has not presented (nor does the record contain) comparator evidence that supports the conclusion that non-pregnant employees were treated any more favorably.[15]   As such, Plaintiff has failed to show

---

[14] Plaintiff testified that she started looking for work as early as November 2010 because the Behavioral Health department was slow.

[15] An obvious problem with Plaintiff's reasoning is that she was fired six months after she gave birth. However, as noted, Plaintiff is still assumed to be a member of the protected class of pregnant individuals, though under the circumstances here, that assumption is stretched to its logical limit.

a requisite nexus between her pregnancy and termination and therefore cannot make a prima facie case of disparate treatment.

However, even assuming that Plaintiff has made her *prima facie* case as to her termination, her claim would still fail. Under *McDonald Douglas*, once Plaintiff has made her *prima facie* case, she would be entitled to a presumption that UM discriminated against her. To rebut the presumption, UM claims that its actions were the result of error, not of discriminatory intent. The burden on an employer to produce a non-discriminatory reason for the employment action is "exceedingly light[.]" The burden is one of production, not proof.   *Ledbetter v. Goodyear Tire and Rubber Co., Inc.,* 421 F.3d 1169, 1185 (11th Cir. 2005) (citations and internal quotations omitted). As such, UM would have sufficiently met its burden by citing its mistake as the non-discriminatory reason for Plaintiff's firing.

Plaintiff would bear the ultimate burden of proof to show that the proffered reason was pretextual and that UM's decision to fire her was motivated by her pregnancy. In that event Plaintiff must show "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in UM's rationale in order to rebut the proffered reason. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997). Plaintiff has failed to marshal any evidence which tends to show that UM's claim of mistake was merely pretext for its discriminatory intent. While UM admits it did not properly apply its per diem policies with respect to Plaintiff's firing, Plaintiff has not offered any evidence to show that UM's claim of mistake was merely a cover for discriminatory intent. *See Alvarez v. Royal Atlantic Developers,* 610 F.3d 1253, 1266 (11th Cir. 2010); *c.f.  Nix v. WLCY Radio/Rahall Commc'ns,* 738 F.2d 1181, 1187 (11th Cir. 1984) ("[An] employer may fire an employee for a good reason, a bad reason, *a reason based on erroneous facts*, or for no reason at all, as long as its action is not for a

discriminatory reason.") (emphasis added).  As such, Plaintiff's claim that she was fired because she was pregnant would fail even if it were assumed that Plaintiff had made her *prima facie* case under the *McDonald Douglas* framework.

### 2. The Record Does Not Present a Convincing Mosaic of Circumstantial Evidence of Discrimination

Plaintiff argues that the record contains an "overwhelming amount" of circumstantial evidence that shows that UM acted with discriminatory intent.  Plaintiff claims that as a result, under the standard of *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321 (11th Cir. 2011), she is entitled to submit her claims to a jury.  Plaintiff's assertions of "overwhelming" circumstantial evidence are contradicted by the record.  At most, the record contains two potential instances of discrimination – UM cutting Plaintiff's hours and UM firing Plaintiff without cause.  But neither act is circumstantially probative of discriminatory intent because of there is no nexus to Plaintiff's pregnancy.  The only connection between Plaintiff's pregnancy, her hours being cut, and her wrongful termination is that the allegedly discriminatory acts occurred shortly after Plaintiff returned from maternity leave.  Plaintiff has not pointed to anything suggestive of causality or motive and the fact that UM took these actions after Plaintiff returned from maternity leave is not, in and of itself, probative of discriminatory intent.[16]

---

[16] Even if circumstantial evidence from before August 25, 2010 were considered, the evidence is insufficient to reach a jury.  Insofar as Santa's request to HR in April 2010 to require Plaintiff to be medically cleared is evidence of discriminatory intent, its probative value is undercut by the fact that Plaintiff's doctor did, in fact, impose a lifting limitation on her.  Therefore, it is no less likely that Santa's recommendation to HR was the result of his belief that Plaintiff could not safely do her job.  With respect to Plaintiff's requests of June and July 2010 to Department personnel to schedule her shifts to accommodate her childcare responsibilities, Defendant correctly asserts that its alleged failure to accommodate Plaintiff's gender-neutral childcare responsibilities is not evidence of discriminatory intent because Defendant had no legal obligation to do so.  *See Piantanida v. Wyman Ctr.*, 116 F.3d 340, 342 (8th Cir. 1997) ("In examining the terms of the PDA, we conclude that an individual's choice to care for a child is not a 'medical condition' related to childbirth or pregnancy.")  Plaintiff's final allegation that she was targeted for termination in June 2010 because she was the sole pregnant participant in a class-action grievance is suspect.  Plaintiff has not adduced any evidence to suggest that her pregnancy was a factor in what appears from the record only to be an innocent inquiry by Santa to HR regarding the employment status of an employee in his department.  Moreover, Plaintiff fails to link that inquiry of June 2010 to her termination in March 2011.

Plaintiffs that have alleged pregnancy discrimination and have reached the jury using the *Lockheed-Martin* standard have done so with evidence much more suggestive of the employer having harbored discriminatory intent, for example, comments by management that were colorable as discriminatory or failure to accommodate a pregnant employee contrary to company policy. *See e.g., Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249 (11th Cir. 2012). Based on the record here, Plaintiff cannot show that UM has discriminated against her because of her pregnancy, even when every factual inference is drawn in her favor. As such, the Court must grant UM summary judgment.

## IV.   CONCLUSION

Based on the foregoing, it is

ORDERED THAT

(1) Defendant's Motion [DE 10] is GRANTED IN PART AND DENIED IN PART. Insofar as Defendant seeks Summary Judgment the motion is GRANTED. The Court is entering a separate Order on Defendant's Motion for Sanctions and a Separate Final Order of Judgment.

(2)  The CASE IS CLOSED.

(3) All pending motions not otherwise ruled on are DENIED AS MOOT.

DONE AND ORDERED in Miami, Florida, this ___23ʳᵈ___ day of September, 2013.

PATRICIA A. SEITZ
UNITED STATES DISTRICT JUDGE

cc:   Honorable Andrea M. Simonton
      All Counsel of Record

14